UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM A. MORRIS,

Plaintiff,

v.

ANDREW SAUL,

Defendant.

Case No. 18-cv-06672-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 14, 21

## I.    INTRODUCTION

Plaintiff William A. Morris brings this action appealing the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner"),[1] denying Morris's application for disability benefits under Title II and Title XVI of the Social Security Act. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, Morris's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings consistent with this opinion.[2]

## II.    BACKGROUND

William A. Morris is a thirty-six-year old former software engineer with a college degree. Administrative Record ("AR," dkt. 13) at 81. He alleges disability due to depression and insomnia beginning on August 26, 2013. *Id*. at 83.

---

[1] Andrew Saul was confirmed as Commissioner while this action was pending and is therefore substituted as the defendant as a matter of law. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

### A. Morris's Medical Records

The primary focus of the parties' arguments and Morris's claim of disability is on his claimed depression and insomnia. While Morris submitted medical records related to his chronic back pain, *see id.* at 378–459; 557–62, Morris does not allege disability based on his back pain. *See id.* at 83, 92 (listing only "Depression" and "Insomnia" as disabling conditions). Accordingly, this summary of Morris's medical records does not include records pertaining to his back injury or other medical problems and is not intended to be a complete recitation of Morris's medical history.

As a child, Morris was "very shy [and] did not socialize[;] had no friends and struggled." *Id.* at 336. He was afraid of his father, "who was always angry." *Id.* at 370. His father died of a heart attack when Morris was thirteen years old. *Id.* at 333. Academically, his grades were "not good before college" because he reported being "Bored" in class. *Id.* at 331. Morris's medical records indicate that he has struggled with depression since childhood. *Id.* at 329 (reporting depression "as early as he could remember."). He received therapy during his adolescence. *Id.* at 335. His first psychiatric hospitalization occurred when he was thirteen years old: "he became belligerent, argumentative and potentially dangerous with himself and his mother admitted him to a psych. unit." *Id.* at 364.

Insomnia also began in Morris's childhood. *Id.* at 324 (Morris's mother recounting that, in grade school, Morris "slept a lot in class; took 'a bomb to wake him up. . . . Circadian rhythm disturbance since grade school."); *see also id.* at 333 ("difficulty falling asleep as a child, tired all the time."). He "hated" his childhood but was "uncertain whether it was because he was depressed or because of his childhood." *Id.* at 350. As a teen, he exhibited "some aggression." *Id.* at 320. His relationship with his mother was "not great." *Id.* at 555.

Morris attended a traditional high school for one year, then attended a boarding high school in Montana called Spring Creek Lodge Academy for 15 months following a suicide attempt. *Id.* at 336, 341. Morris went there between the ages of 16 and 18 "against his will" without any family visits. *Id.* at 319. For Morris, the locked facility was "kind of a living skinner box." *Id.* Morris "still [has] dreams about it." *Id.* at 320. As a result, Morris "[h]as unresolved

issues of abandonment from mother . . . . Has never felt accepted in his own family." *Id*. at 365.

In college, Morris deepened his love of computer science, which lead to a career in the field as a software engineer. *Id*. at 332; *see also id*. at 257–64 (Work History Report). After college, Morris was married for two years. *Id*. at 332. He has not been in a relationship since his divorce. *Id*.

Morris saw psychiatrist Dr. Carmela Javellana, MD, in Salt Lake City, Utah starting in October of 2013. *Id*. 319–39. He saw her "per recommendation of Dr. Lopez – pretty hard time managing sleep, getting up in AM. May be related to taking Cymbalta, sometimes dreams." *Id*. at 330. He had been placed on leave from his job. *Id*. at 336.

Dr. Javellana completed an initial psychiatric evaluation of Morris on October 9, 2013. *Id*. at 338. She described him as:

> 30 year old single male mostly w/o expression[,] flat affect, wearing black tank top w/ black hair pulled back in ponytail. –Unable to work for past few months due to sleep problems + concentration. . . . Axis I [diagnoses]: (296.90) mood disorder nos; (314.00) ADD; (299.80) Aspergers'; (307.47) Dyssomnia nos.

*Id*. According to Dr. Javellana, "by August sleep + concentration so bad had to leave work." *Id*. at 333. She also noted that Morris was "not close to anyone – socially undeveloped." *Id*. at 334.

At a counseling session with Dr. Javellana, Morris recounted his medication history: he was on Cymbalta "for a few months + it made things worse." *Id*. at 333. He also took Bupropion, which "didn't help." *Id*. at 335. While he was taking these drugs, Dr. Javellana's note indicates that Morris "slept longer & longer." *Id*. The notes reflect that Morris "tried most sleep aids – zolpidem, Lunesta[,] currently take melatonin + Benadryl for sleep." *Id*. Morris reported that Benadryl and melatonin "help inconsistently." *Id*. at 332. Dr. Javellana also reported that Morris had no suicidal ideations. *Id*. at 337. She described his affect as "constricted, blunted," his mood as "apathetic," and his abstract thinking skills as "impaired." *Id*. While she wrote that Morris was a "mensa member → IQ high," *id*. at 334, she rated his intellectual functioning as "average," *id*. at 337. She found his judgment and insight to be "age appropriate," while his concentration, attention and abstract thinking were "impaired." *Id*. She opined that Morris's main strength was his IQ, while his weaknesses were "social skills, sleep." *Id*. at 338. Her prognosis was "fair." *Id*.

On October 23, 2013, Morris told Dr. Javellana that he "would like to sleep and concentrate again." *Id.* at 331. He reported "[d]ifficulty falling asleep, waking up. Prefers sleeping during the day, more awake @ night. Wide awake @ night. Asleep @ random times." *Id.* Morris reported "random loss of focus" that led him to "[f]orget stuff he needs to do easily." *Id.* He and Dr. Javellana set a goal of waking up at 7 AM and going to bed at 11 PM, without sleeping until his bedtime. *Id.*

Morris and Dr. Javellana also discussed his family and social development. *Id.* at 332. He was close to his brother, but "[n]ot that close to either parent. Dad was the one who he had the most interactions with." *Id.* On November 4, 2013, Morris noted that he "doesn't feel emotionally connected to anyone." *Id.* at 329. While he claimed not to know how to engage with people, he was "open to learning" how. *Id.* at 330. At his next meeting with Dr. Javellana, Morris said he was sleeping a little better and for longer, but his energy was "still down." *Id.* at 327. He admitted "[s]ometimes it's nice to be around other people." *Id.*

On December 6, 2013, Morris reported that he was "[s]leeping 10-14 h. regardless of sleep onset – no apparent change in sleep pattern." *Id.* at 325. He explained that he was "[r]eluctant to go to bed @ 10 pm – when he is most productive." *Id.* Dr. Javellana recorded that Morris "[s]pends majority of awake time distracting himself from his own consciousness." *Id.* He claimed that his sleep schedule was "36 h. up, 12 h. asleep." *Id.* Morris and Dr. Javellana also discussed the accident that led to his back pain, although he reported "no functional limitations." *Id.* He and Dr. Javellana planned "work accommodations." *Id.*

On December 23, 2013, Morris told Dr. Javellana that he had a "genetic polymorphism" for the MTHFR gene.[3] *Id.* at 326. He "[d]id this test on his own." *Id.* Dr. Javellana's notes also included a report that Morris's sleep-wake cycles were reversed, perhaps as an effect of Cymbalta. *Id.* He also reported that he had "officially lost his job." *Id.*

---

[3] Methylenetetrahydrofolate reductase, or MTHFR, is a genetic mutation linked to, among other things, depression, bipolar disorder, ADHD, and decreased effectiveness of antidepressants. "A Genetic Mutation That Can Affect Mental & Physical Health," *Psychology Today*, https://www.psychologytoday.com/us/blog/the-integrationist/201409/genetic-mutation-can-affect-mental-physical-health.

On January 22, 2014, Dr. Javellana reported that Morris was taking Gabapentin, Lamotrigine, and Quetiapine. *Id*. at 323. He reported "[n]o change. Quetiapine certainly not helping. Effects are inconsistent/unpredictable. Definitely more difficult to wake up." *Id*. He continued sleeping during the day and being up at night: "36 h. awake, 12 h. asleep, 48 h. awake, 24 h. asleep." *Id*. Dr. Javellana updated her assessment of Morris to "Bipolar/Atypical Depression." *Id*.

On March 24, Morris told Dr. Javellana "Temazepam + Trazodone – hits me like a sledgehammer." *Id*. at 319. He reported sleeping nine to ten hours per night, *id*. at 319, and was "more resigned to his condition," *id*. at 320. He was "still hopeful for recovery: I have good days & bad days – 0-2 good days/week." On his bad days, all he could do was "reading, stuff on computer." *Id*. In terms of interests, Morris also noted that he would "hyperfocus" on "British television . . . x20-30 hours." *Id*. He told Dr. Javellana he was "'several different flavors of tired.' light makes me more tired." *Id*.

By April of 2014, Morris was living in his car. *Id*. at 249. He wrote about his limiting condition in a Functional Report: "I am unable to maintain a consistent sleep schedule. I frequently have difficulty focusing/concentrating." *Id*. During the day, Morris wrote that he would "sit in [his] car, read, play with [his] phone/laptop [and] fill out paperwork." *Id*. at 250. He reported that, since the onset of his disabling condition, he could no longer "maintain a (more or less) consistent sleep schedule. . . . I am sometimes unable to sleep for days at a time and sometimes unable to wake up for days at a time. I can't predict when I will be able to sleep or when I might pass out." *Id*. He reported that he had no problems with personal care, household chores, or ability to handle money. *Id*. at 250–53. His hobbies included "reading, watching TV, watching movies, programming." *Id*. at 253. His ability to engage in those hobbies "varies considerably depending on [his] ability to concentrate." *Id*. Since his illness, he "engage[d] in mentally taxing activities less frequently." *Id*.

Morris reported limitations in his social activities as well. *Id*. at 253. He did not spend time with others and noted that he only travelled to "various parking lots." *Id*. While he went places daily without being reminded, he did not take part in activities "at all." *Id*. Since the onset

of his illness, Morris reported that he had "become increasingly isolated, I have lost any desire to be around other people." *Id*. at 254. He wrote that his condition affected his concentration because he was "frequently sleep-deprived and [found] it difficult to concentrate." *Id*. His ability to pay attention "varie[d] greatly" and he "sometimes" completed tasks. *Id*. However, he wrote that he could follow written and spoken instructions "reasonably well." *Id*. He also answered "reasonably well" when asked how well he got along with authority figures. *Id*. at 255. When asked how well he handled stress and changes in routine, he replied: "I have no basis from which to form an objective assessment. If I had to guess: poorly." *Id*.

On May 13, 2014, Morris was evaluated by psychologist Kathy D. Barnett, Ph.D. after "alleging disability due to depression and insomnia." *Id*. at 340. Morris told Dr. Barnett that his depression was "daily and consistent" since his childhood. *Id*. He felt "[s]hitty. Tired. . . . Suicidal at times." *Id*. Dr. Barnett found Morris to be a "consistent historian" and found no evidence of malingering. *Id*. at 340. They discussed Morris's depression symptoms:

> Pt confirmed experiencing loss of motivation, loss of interest, fatigue, thoughts of death, increased trouble concentrating, isolation, withdrawal, and trouble getting to sleep. Pt noted that he just lays there at night and doesn't sleep. Pt denied worrying or having racing thoughts. He said he doesn't always sleep at night. He said that he sleeps during the day when he doesn't sleep at night and his night's sleep is unpredictable. He denied having episodes of high energy. Pt noted that he can sleep from 8 to 36 hours at a time. When asked how the depression difficulties interfere with daily life, pt said "It's been my life." He has reportedly sought help from a mental health provider. Pt isn't seeing anyone now, but sees Dr. Carmela Javellana, a psychiatrist for medication evaluations and some short counseling sessions.

*Id*. at 341. Dr. Barnett linked Morris's insomnia to his depression: "He seems to sleep as much as he can secondary to low mood and then can't sleep. His reduced periods of sleep are thought to further reduce his mood. Medication appears to help some. Some of the sleep trouble is likely related to attention trouble." *Id*. at 344.

Morris told Dr. Barnett: "'I feel lost at this point. . . . I don't know what to do with myself.'" *Id*. at 341. Dr. Barnett noted in her mental status evaluation that Morris's "[i]nterpersonal functioning appeared limited. Pt's ability to relate to evaluator and interact

seemed reduced." *Id*. at 342. Dr. Barnett also noted that Morris "appeared to have some trouble with attention as when asked a question he seemed to need time to gather his thoughts." *Id*. She also noted that "[i]t was difficult to assess inattention with the various features of depression present." *Id*.

In her summary, Dr. Barnett explained:

> Findings are consistent with a DSM-IV diagnosis of Attention Deficit Disorder mixed type, mild. Pt reports that he experiences longstanding trouble with attention that began in childhood, occurs in a variety of settings, and continues today. Pt reportedly had difficulty with focus, sitting still, getting bored easily, getting organized, and distraction. . . . Pt's symptoms of depression overshadow his inattention difficulties. It is thought that when he is less depressed, such as when he had a residence, his attention troubles were more pronounced. Overall though, they are considered relatively mild. . . . Results suggest that given pt's presentation and symptom description pt is expected to have quite a lot of trouble with motivation, low energy, and avolition. He is apt to have limited follow-through as well.

*Id*. at 344. She predicted that "[t]he level of pt's mental health functioning is expected to improve with stable residence, medication, increased activity, and increased pleasant day events." *Id*.

On May 21, 2014, Morris was admitted to inpatient psychiatric care following a suicide attempt. *Id*. at 348–353. Morris was found unresponsive in his car, alongside empty bottles of trazodone, temazepam, and "multiple empty bottles of liquor." *Id*. at 354. The ambulance brought him to the Intermountain Medical Center, which transferred him to McKay-Dee Hospital Center in Ogden, Utah. *Id*. at 348. When asked about the incident, he said, "'I swallowed a bunch of pills. . . . [t]o accelerate the end of my life. . . . I just figured it was about time. . . . I still feel that way.'" *Id*. at 349. He told doctors that he "'generally [does not]'" sleep and that his concentration was "'not great.'" *Id*. Morris "admit[ted] to some mild use of alcohol, more binge drinking," along with some other drugs "here and there." *Id*. Later, he admitted to "a history of cocaine, mushrooms, and LSD . . . [and] a more recent history of marijuana." *Id*. at 355. He also noted smoking "about 1/2 pack of cigarettes per day" and drinking "'[a]s many [caffeinated beverages] as I can get my hands on.'" *Id*. at 349. While he lived in his car, however, his caffeine and alcohol use declined. *Id*. at 355. At the time of the overdose, he had "not been drinking very much at all." *Id*. Dr. Dennis H. Smith described the suicide attempt as "close to being an actual

7

suicide." *Id.* at 351. In Dr. Smith's opinion, Morris was experiencing "fairly severe chronic treatment resistant major depression. . . . treatment needs to be fairly aggressive." *Id.* at 352. Upon discharge, Dr. Smith opined that, despite "some mild episodic suicidal ideation essentially throughout his stay," Morris was a low risk to himself and others. *Id.* at 358.

On June 26, 2014, Morris reported that he was taking aripiprazole, Bupropion, and venlafaxine for depression and trazodone for insomnia. *Id.* at 269. He did not report any side effects. *Id.* He listed his brother James as a contact who could provide insight into his disability. *Id.* at 267.

Dr. Javellana wrote a letter of support accompanying her physician's source statement on June 30, 2014. *Id.* at 362–67. After losing his job and failing to qualify for short-term benefits, Dr. Javellana explained, Morris's condition "deteriorated significantly," with the deterioration leading to his May 2014 suicide attempt. *Id.* at 362. She felt that granting benefits would help Morris's recovery, while denying them could have dire consequences:

> I believe that absent financial assistance through long-term disability, which [the SSA has] denied, he is likely to attempt to take his life again. Your financial support could help him tremendously with medical and psychiatric care which he desperately needs, a better quality of life, more positive view of himself, and hope for getting back on his feet in the future . . . . [T]ime is of the essence – this could mean life and death for him.

*Id.*

Dr. Javellana completed a Medical Opinion and Functional Questionnaire on June 17, 2014, which she attached to her June 20, 2014 letter. *Id.* at 364–67. On the form, Dr. Javellana indicated that she had been seeing Morris monthly since October of 2013. *Id.* at 364. She noted that Morris "has been able to keep appointments – However, remains flat in affect, despondent, pessimistic, overwhelmed to inaction with what he has to do." *Id.* She described the June incident as a "serious suicide attempt with <u>intent</u> to kill himself." *Id.* She also noted "significant psycho-motor retardation." *Id.* at 365. While Morris did not exhibit any psychotic symptoms, he did suffer from "<u>profound</u> apathy & anhedonia. . . . No interests @ all!" *Id.* at 366. She also noted his "unpredictable, and unregulated" sleep schedule. *Id.* In addition, she had difficulty engaging Morris and getting him to participate in conversation with her. *Id.* Her diagnosis was "Treatment-

Resistant Major Depression . . . Dysthymia, no psychotic features (296.33, 300.4); Autism Spectrum Disorder (299.00)." *Id*. Her assessment of Morris's prognosis was "[v]ery poor. Patient may likely attempt suicide again if obtains no support for his disability." *Id*. She added: "Patient is in <u>DIRE</u> <u>NEED</u> of funds for his <u>survival</u>." *Id*. at 367.

In July of 2014, Morris saw Richard L. Cox, Ph.D., twice. *Id*. at 555–56. Morris reported "[s]leep[ing] 8-13 hours/day; low energy level; fairly often has thoughts of death and suicide; decreased ability to concentrate or make decisions." *Id*. Dr. Cox remarked that "he 'pretty much always hated life.'" *Id*. When asked about his hobbies, Morris reported that he used "computer games and watching movies to distract his negative thoughts." *Id*. at 556. He told Dr. Cox that he did not have any hobbies or "many friends that he did things with." *Id*. Dr. Cox asked what Morris "finds exciting or exhilarating: He likes going fast, such as driving his car fast; and he might like to try sky-diving." *Id*. Morris "continue[d] to deny any intent or plan to suicide." *Id*.

After he moved from Utah to the San Francisco Bay Area, Morris saw Peter Cohen, M.D., on September 10, 2014. *Id*. at 369. Morris told Dr. Cohen, "'I need refills of my medication, although they aren't really helping.'" *Id*. He also "admit[ted] to substance use 'when it's around and I have money.' He will binge drink. Not much current use, as he is broke." *Id*. Dr. Cohen diagnosed Morris with "Major Depression, recurrent; Dyssomnia." *Id*. at 373. In a progress note dated September 29, 2014, Morris rated his mood "from 30-40 on a scale of 100. He's been as high as an 80 when he was working." *Id*. at 374. Since he moved to the Bay Area, Morris "goes out with his uncle to have a drink every few weeks. Smokes cannabis ever [sic] few days." *Id*. Morris again reported that "his biggest problem is his erratic sleep schedule. . . . When he sleeps, he sleeps 6-12 hours." *Id*. at 374. His "[g]lum demeanor" was "unchanged." *Id*. at 376.

On December 4, 2014, Morris told interviewer J. Patten that Dr. Peter Cohen added desvenlafaxine, olanzapine, and zyprexa for depression. *Id*. at 301. He now listed his aunt, Mary Feeney of Hercules, CA, as his contact. *Id*. at 298.

After moving in with his aunt in Hercules, California, Morris received treatment from Contra Costa Health Services. *Id*. at 460–523. In his initial intake assessment, conducted on

9

December 18, 2014,[4] Morris recounted his history of depression, which he said he'd suffered from "all of his life." *Id*. at 461. He also mentioned his trouble with sleeping "anywhere from 10 hrs to 36 hrs . . . . When he sleeps, he over sleeps 5 to 6 hours up to a day and a half." *Id*. Morris also mentioned that his brother struggled with sleep issues. *Id*. He described the shame he felt about being unemployed as a result of his disability and living with his aunt. *Id*. He also "report[ed] socially drinking w/ uncle, smoking cannabis drug for poor sleep & pain." *Id*. At the time of the assessment, Morris had suicidal ideation but no plan. *Id*. at 462. He also mentioned "Chronic Back pain – auto accident." *Id*. at 463. When discussing his substance use, Morris told the provider about a DUI in 2007. *Id*. at 464. He described his drug and alcohol use as "sporadic," but reported daily use of marijuana, tobacco, and caffeine, including "occasional energy drinks." *Id*. Morris explained that he used the marijuana to help with sleep and drank socially. *Id*. at 465. The examiner qualified the diagnosis of alcohol abuse with "(weekend warrior)." *Id*. at 466. Regarding Morris's mental status, the examiner found that Morris's thought process was "responsive/some memory loss," his memory and thought content were "poor to fair," as was his insight, judgment, and impulsivity. *Id*. at 466. The examiner assessed Morris's impairment in social relations as between moderate and severe, his physical health impairments as between mild and moderate, his impairments due to substance abuse as being between moderate and severe, and his impairments in activities of daily living as being moderate. *Id*.

On January 13, 2015, Morris visited Dr. Simret Nanda, M.D., for an assessment update. *Id*. at 470–73. Dr. Nanda noted that, while Morris's thought process was "coherent," his psychomotor activity was "slowed." *Id*. at 472. She also noted that Morris displayed moderate functional impairment in "Cognition/Memory/Thought" and mild impairment in "Attention/Impulsivity." *Id*. at 472. In addition, she noted that his impairment in peer relations was severe, that his physical health impairments were moderate, and that his substance abuse impairment was mild. *Id*. She found that Morris also exhibited severe impairments in "Socialization/ Communication," "Depressive Symptoms," and "Peer Relations." *Id*. at 472–73.

---

[4] The assessment appears to have been conducted by a staff member and signed off by a marriage and family therapist ("MFT"). Both signatures are illegible, however.

10

Morris's treatment at Contra Costa Health Services "focused on pt's emotional Functioning and community functioning," *id*. at 481, while Morris continued to report symptoms of depression and sleep disorder, *id*. at 481–92.

On February 3, 2015, Morris discussed with Dr. Nanda his possible MTHFR genetic deficiency, which he said he discovered by participating in 23 and Me. *Id*. at 487. She ordered "Assure Rx[5] genetic testing" to determine which medications would be effective. *Id*. at 493. The results, which Dr. Nanda received on March 24, 2015, revealed that "[Morris] is a poor metabolizer of 2D6 & rapid metabolizer of 2C18. Effexor XR is a #3 which means it[']s difficult to predict what will happen on current dose due to differing pathways. Recommended is Prisig (3A4) & Viibryd." *Id*. at 501. She followed those recommendations and prescribed Viibryd on April 2, 2015. *Id*. at 503. He reported some nausea on the new drug, *id*. at 513, and reported that he "still feels the same on the medicine." *Id*. at 517. Morris asked to "try an MAO-I b/c he did research on the internet about this medicine." *Id*. In the summer of 2015, Dr. Nanda prescribed such a drug, the Emsam patch, for Morris's depression. *Id*. at 527. After trying the drug, Morris reported no change in his depression symptoms and, other than fleetingly exacerbating his back pain, no side effects. *Id*. at 529. Dr. Nanda consistently noted that Morris's thought process was "coherent and linear." *Id*. at 487, 513, 521, 529, 543, 547, 549.

Morris continued to have sleep difficulties, *see id*. at 513, 517, 529, and continued to treat them using marijuana. *Id*. at 487 ("Last night he slept well after smoking cannabis and slept from 12am-10am."). He missed appointments because of his erratic sleep schedule. *Id*. at 491, 541. Morris was even "fired from his therapist because he did not want to change his sleep schedule and states 'sleep hygiene doesn't work for me.'" *Id*. at 543. In a May 26, 2016 phone check-in with Dr. Nanda, Morris reported that he spent a week and a half to two weeks in bed and "couldn't get out of bed. His mood is 5/10. He still has no motivation to do anything. Sleep is erratic[ ]." *Id*. at 567. Morris told Dr. Nanda he thought he might have dysautonomia and wanted to see a

[5] "AssureRx Health, Inc. is a personalized medicine company that specializes in pharmacogenomics dedicated to helping physicians determine the right drug for individual patients suffering from neuropsychiatric and other disorders." "AssureRX Launches New Product." *genesight* (Oct. 23, 2009) https://genesight.com/assurerx-launches-new-product/.

11

neurosurgeon at Stanford. *Id.*

As part of his disability claim, Morris's record was evaluated by consultative physician Dr. Lisa Renner, M.D., who reviewed the record on May 14, 2014. *Id*. at 87. While Dr. Renner found that Morris was suffering from an affective disorder "that does not precisely satisfy the diagnostic criteria" of listing 12.04, she also found that he had mild restrictions in activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no repeated episodes of decompensation of an extended duration. *Id*. at 86–87. Dr. Renner answered "No" when asked whether she thought Morris had limitations in understanding, memory, sustained concentration, or persistence. *Id*. at 88. She found Morris's allegations of disabling symptoms "partially credible": "he has received dx and treatment for symptoms, however severity is not supported. Claimant is able to persist at tasks that can be learned in up to three months on the job within physical limitations." *Id*. at 89. She found Morris "Not Disabled." *Id*. at 90. She added, "[t]here is no evidence of any substance abuse disorder/DAA issue." *Id*. at 91.

At the reconsideration stage, consultative physician Dr. Robert C. Scott, M.D., reviewed the record and assessed Morris's paragraph B symptoms differently than did Dr. Renner; Dr. Scott opined that Morris had moderate restrictions of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. *Id*. at 111. Dr. Scott also noted that Morris had "One or Two" episodes of decompensation "Each of Extended Duration." *Id*. Dr. Scott also answered "Yes" when asked whether Morris had "sustained concentration and persistence limitations." *Id*. at 114. Nevertheless, Dr. Scott found "[h]is overall presentation does not preclude sustained tasks related to his career in software . . . . Appears able to maintain such a routine in a setting where interpersonal interaction is limited." *Id*. at 112. Dr. Scott also opined that Morris's "[a]llegations are not fully consistent with the findings and the level of activity presented, which indicate a greater degree of functional ability than alleged." *Id*. at 113.

Dr. Scott dismissed Dr. Javellana's June 2014 letter and the accompanying Physician's Source Statement because it "relies heavily on the subjective report of symptoms and limitations

provided by the individual, and the totality of the evidence does not support the opinion. The opinion is without substantial support from other evidence of record, which renders it less persuasive." *Id*. at 115. He, too, found Morris "Not Disabled." *Id*. at 116. He echoed Dr. Renner's assessment that Morris's records did not contain evidence of a substance abuse disorder. *Id*. at 117.

**B.    Initial Denial of Application**

Morris filed his application for disability benefits on February 27, 2014, *id*. at 92, and was denied on May 14, 2014, *id*. at 133. Morris submitted a request for reconsideration on June 18, 2014. *Id*. at 139. That request was denied on November 10, 2014. *Id*. at 143. He requested a hearing on December 4, 2014. *Id*. at 149. This request was granted on May 18, 2016. *Id*. at 162.

**C.    Administrative Hearing**

An administrative hearing was held on June 1, 2016 in Oakland, CA. *Id.* at 63. Administrative Law Judge ("ALJ") Major Williams presided over the hearing. *Id.*. at 32. Negin Mohajeri, the attorney who represented Morris at the hearing, argued that the record reflected that "Mr. Morris cannot complete a normal work day or work week, primarily due to psychological problems." *Id*. at 64. She pointed to the medical source statement from Dr. Javellana, whom she identified as Morris's treating psychiatrist. *Id*. (citing *id*. at 362–67). The attorney also noted frequent references in the medical records to low GAF scores (as low as 40) and "suicidal ideation[ ]." *Id*. (citing *id*. at 460–552). Finally, she argued that Morris's drug and alcohol use were "not material" to the disability claim because his cannabis use was for pain associated with his back injury and to assist with sleep while his alcohol use was infrequent. *Id*.

The ALJ then questioned Ashok Khushalani, an independent medical expert. *Id*. at 65. Dr. Khushalani told the ALJ that he could not give his assessment because he did not have access to the full record. *Id*. at 66. He did not have Exhibits 6F, 7F, or 8F, the last of which Morris's attorney described as "the majority of the supportive evidence." *Id*. Dr. Khushalani agreed to provide interrogatory responses after the hearing. *Id*.

The ALJ then heard testimony from Dr. Gerald D. Belchick, a vocational expert ("VE"). *Id*. at 67. The VE summarized Morris's past employment: Morris worked as a software engineer,

13

which is a sedentary highly skilled job with an SVP of 8; a programmer, which is also a highly skilled sedentary job with an SVP of 7; a data analyst, which is highly skilled with a light exertional level and an SVP of 7; a software intern, which is a skilled, sedentary job with an SVP of 5; and a teaching assistant, which is a skilled job with a light exertional level and an SVP of 5. *Id*. at 67–68. He summarized: "all of Mr. Morris' work has been at the skill[ed] level, some are at the high skills level and it's all been either light or sedentary." *Id*. at 68. The ALJ did not give the VE any hypotheticals and did not ask any further questions of the VE. *Id*.

The ALJ then questioned Morris, who testified that he stopped working on or around August 26, 2013 because he "just couldn't get out of bed for a week." *Id*. at 69. Morris testified that he was currently seeing Dr. Simret Nanda, a psychiatrist. *Id*.

Morris's attorney asked him to explain his drug use. *Id*. at 70. He testified that his marijuana use "varies considerably. I haven't [used marijuana] for the last, I don't know, several months since my card expired. . . . Before then, you know, whenever I had the money to acquire some, which was pretty rare, like once every couple of months, I would consume it until it was gone." *Id*. at 70–71. He used medical cannabis "[p]rimarily [for] pain" caused by a 2012 car accident. *Id*. at 71. At the time of the hearing, Morris was using Oxycodone which "helps to some extent." *Id*. Morris testified that cannabis also helped him sleep. *Id*. He explained, "I have tried a vast array of sleep aids, and none have been consistently helpful." *Id*. Morris testified that his alcohol use was "rare" because he seldom had "cash to acquire any." *Id*. at 72. He estimated that he drank "like once a month, if that." *Id*. He agreed with his attorney's description that "once a month, the[re]'ll be one time that you drink a few drinks." *Id*. at 73. Morris testified that alcohol did not change his mood. *Id*.

In response to the ALJ's question asking Morris which symptoms were worse, physical or mental, Morris testified: "[A]s far as impairing my ability to function, I guess it would be the mental stuff." *Id*. at 74. His attorney summarized Morris's diagnoses as major depressive disorder, anxiety, "Asperger disorder," and a sleep disorder. *Id*. Morris testified that he "struggle[s] to focus. I have basically no control over when or how much I sleep." *Id*. Morris's attorney confirmed that Morris was "admitted in the hospital for seven days in 2014" for a suicide

14

attempt. *Id*. at 74–75. Morris also testified that he was hospitalized once as a teenager. *Id*. at 75.

Morris's attorney characterized his history of mental health hospitalizations as "an ongoing issue,"

but noted that Morris had not been hospitalized since the incident in 2014. *Id*.

Morris and his attorney discussed how his suicidal ideations have "been pretty consistent."

*Id*. When his attorney asked if he had "any sort of plan" to take his own life, Morris responded:

"Well, I mean one always has plans, but . . . . I mean I do . . . . Do I think it's likely to happen in

the near future? Probably not." *Id*. When asked whether suicide is "something [he] think[s]

about consistently," he responded "Yeah." *Id*. at 76.

Morris listed his medication regimen:

> Currently, all I'm taking is Vitamin D, which the GP prescribed. I
> had previously been taking [Emsam] . . . It's a transdermal selegiline
> patch and my psychiatrist basically just told me to discontinue it
> because it didn't seem to be doing anything for me. . . . [M]y current
> psychiatrist is talking about potentially getting me into a study that I
> think is dealing with Ketamine, but I'm not sure, you know, what the
> deal is with that.

*Id*. He agreed that he was "currently not on any medications because none of the medications they

tried [him] on have worked." *Id*. He reported trying around "five or six" medications since the

end of 2013. *Id*. at 77.

Morris testified that he "doubt[ed]" he could work even a basic, routine job. He testified:

> [T]he main issue is that I -- I mean as far as preventing me from
> working is that I just can't control when and how much I sleep. So
> sometimes I'll sleep for just days at a time. . . . And sometimes I'll be
> awake for days at a time and I -- like as I said, I just can't seem to
> exert any kind of control over it as this point.

*Id*. He testified that he still had days when he wasn't able to get out of bed. *Id*. at 78. He

attributed his inability to get out of bed to not having anything to do and not having any

motivation "to do even the things I want to do." *Id*. Morris testified that he lived with his aunt but

did "[n]ot consistently" help with housework." *Id*. He testified that he decided whether to help

with housework based on "[w]hether or not there's anything to be done and whether or not I feel

up to doing it." *Id*. at 79.

After the hearing, Dr. Khushalani answered the ALJ's interrogatories on November 8,

2016. *Id*. at 580–87. Dr. Khushalani opined that Morris had "mild" impairments in his abilities

to understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions. *Id*. at 580. He also found that Morris had a marked inability to understand and remember complex instructions as well as a marked inability to carry out complex instructions. *Id*. He found a marked restriction in Morris's ability to make judgments on complex work-related decisions. *Id*. He based his assessment on Morris's "H/O major depression, alcohol abuse [and] cannabinoid dependence." *Id*. (citing *id*. at 347–61, 368–77, 554–56, 460 – 552). *Id*. Dr. Khushalani also noted that Morris had been diagnosed with ADHD. *Id*. (citing *id*. at 340–46).

However, Dr. Khushalani felt that Morris could "interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting, affected by impairments[.]" *Id*. at 581. Dr. Khushalani found that Morris had moderate impairments in his ability to interact appropriately with the public and his ability to respond appropriately to usual work situations and to changes in a routine work setting; he found Morris had mild impairments in his ability to interact appropriately with supervisors and with co-workers. *Id*. He added: "Claimant has H/O alcohol abuse and cannabinoid dependence. These may be material to the intensity of his depression." *Id*. Dr. Khushalani opined that Morris could not "manage benefits in [his] own best interest" because of his "H/O Alcohol abuse." *Id*. at 582.

In assessing the paragraph B criteria, Dr. Khushalani found that Morris had mild restriction in his activities of daily living, moderate difficulties in maintaining social functioning, and no episodes of decompensation. *Id*. at 584. With regard to Morris's difficulty in maintaining concentration, persistence, or pace, Dr. Khushalani found Morris would have mild difficulties "for simple [tasks], moderated for detailed[;] marked for complex." *Id*. Overall, Dr. Khushalani found that Morris did not meet the criteria for an SSA listing, in part because of his alcohol and cannabis use: "The claimants drug and alcohol abuse are material to his major depression. There has [not] been a period of sobriety to assess his functioning while sober. Also his medication response has not been sober due to possible interaction with alcohol and marijuana." *Id*. at 585. He concluded "[c]laimant would be able to do simple tasks with occasional public contact when sober." *Id*. at 587.

16

**D.     Regulatory Framework for Determining Disability**

### 1.    Five-Step Analysis

When a claimant alleges a disability and applies to receive Social Security benefits, the ALJ evaluates the claim using a sequential five step process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the applicant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically determinable impairment. Impairments are severe when "there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, the claimant is not disabled; if the claimant does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled. If not, the ALJ moves to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or RFC, to assess whether the claimant could perform her past relevant work. 20 C.F.R. § 404.1520(a)(1). The RCF is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1520(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, the claimant is not disabled; if the claimant is not able to perform such past relevant work, the ALJ continues to step five. In the case of claimants who are fifty-five or older, are restricted to sedentary work, have no transferable skills, and have not completed any relevant vocational education, the Commissioner will usually not offer any

evidence of work meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to perform past work.  20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

At the fifth and final step, the burden shifts from the claimant to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

### 2.  Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a;[6] *see also Clayton v. Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)).  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(b)(2), (c).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or

---

[6] Effective January 17, 2017, the Social Security Administration changed the language of § 404.1520a from "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation" to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."  *See* Revised Medical Criteria for Evaluating Mental Disorders, 74 Fed. Reg. 51336, 51341 (August 19, 2010); 81 Fed. Reg. 66138, 66159-60 (Sept. 26, 2016).  Because Morris filed his application in 2014, AR at 21, the language before the rules change applies and the Court will apply the language in effect at the time of Morris's filing for the purpose of this opinion.

equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R.

§ 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability

inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

presence of various listed mental impairments, but all listed mental impairments share certain

"Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically

determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

general Paragraph B criteria, which require that the claimant suffers at least two of the following:

(1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social

functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or

(4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked"

limitation is one that is "more than moderate but less than extreme" and "may arise when several

activities or functions are impaired, or even when only one is impaired, as long as the degree of

limitation is such as to interfere seriously with [a claimant's] ability to function independently,

appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

This evaluation process is to be used at the second and third steps of the sequential

evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The

adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C'

criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at

steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the

claimant has one or more severe mental impairments that neither meet nor are equal to any listing,

the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§

404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

sequential process [and] requires a more detailed assessment by itemizing various functions

contained in the broad categories found in paragraphs B and C of the adult mental disorders

listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL

1    374184, at *4.

2        E.    **The ALJ's Decision**

3        In a decision dated February 21, 2017, the ALJ found that Morris was not disabled under

4    the Social Security Act.  AR at 21.  He found that Morris met the insured status requirement and

5    that he had not engaged in substantial gainful activity since August 26, 2013, the alleged onset

6    date of his disability.  *Id*. at 23.  The ALJ found that Morris had "the following severe

7    impairments: major depressive disorder; mild attention deficit disorder (ADD); substance abuse

8    (cannabinoid/ETOH dependence)."[7]  *Id*. (internal citations omitted).

9        The ALJ acknowledged Morris's claim of hypersomnia: "the claimant reported that he has

10   trouble falling asleep, but once he falls asleep, he oversleeps."  *Id*. at 24 (citing *id*. at 483).  The

11   ALJ found that "the evidence does not establish that this condition more than minimally affects his

12   ability to perform basic work activities."  *Id*.  The ALJ opined that Morris's "sleep issues are not

13   managed largely due to lifestyle choices" such as not abiding by a consistent sleep schedule,

14   staying up late, and drinking energy drinks.  *Id*. (citing *id*. at 325, 386, 517, 543).  Therefore, the

15   ALJ found, Morris's hypersomnia and insomnia were not severe impairments.  *Id*.

16       The ALJ also found that Morris's alleged back pain was non-severe because the record did

17   not include claims of physical impairment or functional limitations due to back pain.  *Id*. (citing *id*.

18   at 325, 341).  In addition, the ALJ noted that "while the claimant's back pain stemmed from

19   involvement in a motor vehicle accident in February 2012, he was able to work after his injuries

20   until he stopped working in August 2013 due to his mental conditions."  *Id*. (internal citations

21   omitted) (citing *id*. at 394).

22       Next, the ALJ determined that Morris's alleged impairments did not meet or equal any of

23   the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  *Id*.  Because Morris alleged a

24   mental impairment, the ALJ evaluated the severity of his condition using the "paragraph B"

25   criteria from listings 12.04 and 12.11.  *Id*.  The ALJ assessed Morris's functioning in

26

27   ────────────────

28   [7] "ETOH dependence" means dependence on alcohol.  *See Payne v. Astrue*, No. 1:11-CV-416-
     TFM, 2012 WL 1190852, at *3 (M.D. Ala. Apr. 10, 2012) (parenthetical explaining that ETOH
     dependence is a "medical diagnosis of alcohol dependence"); *see also* Pl's Mot. at 5 n.1.

                                            20

1  "understanding, remembering, or applying information; interacting with others; concentrating,

2  persisting, or maintaining pace; or adapting or managing themselves." *Id*. at 24. "To satisfy the

3  'paragraph B' criteria, the mental impairments must result in at least one extreme or two marked

4  limitations" of the assessed categories. *Id*. The ALJ found that Morris had "moderate limitations"

5  in understanding, remembering, or applying information; "moderate limitations" in interacting

6  with others; "moderate limitations" in concentrating, persisting, or maintaining pace, and "mild

7  limitations" in adapting or managing himself. *Id*. at 24-25.

8         In finding that Morris had moderate limitations in understanding, remembering, or

9  applying information, the ALJ pointed to Morris's testimony "that he struggles to focus and he

10  lacks motivation to do things" and to his self-reported symptoms in the Function Report, which

11  included "difficulty focusing and concentrating." *Id*. at 24 (citing *id*. at 249–56). However, the

12  ALJ found that other reports in the record did not show limitations in this category, such as a May

13  2014 evaluation from Dr. Barnett and the results of the Montreal Cognitive Assessment (MOCA)

14  that she administered. *Id*. at 25 (citing *id*. at 321). The ALJ also noted that Morris's IQ "was

15  thought to fall in the normal to above average range." *Id*.

16         In finding that Morris had moderate limitations in interacting with others, the ALJ again

17  looked to Morris's Function Report, in which Morris indicated "that he does not spend time with

18  others and he has become increasingly isolated and has lost any desire to be around other people;

19  however, he reported not having any problems getting along with family, friends, neighbors, or

20  others." *Id*. (citing *id*. at 249–56). The ALJ pointed to Morris's relationships with his brother and

21  aunt. *Id*. Finally, the ALJ noted that the consultative psychologists and the psychiatric medical

22  expert "opined that the claimant has moderate difficulties in this area." *Id*. (citing *id*. at 87, 111,

23  124, 584[8]).

24         In finding that Morris had moderate limitations in concentrating, persisting, or maintaining

25  pace, the ALJ pointed to the Function Report and Morris's testimony at the administrative hearing

26  that he "struggles to focus and. . . . frequently has difficultly focusing/concentrating, as he is

27

28  ---
[8] The ALJ also cites Exhibit 6A at 5. AR at 25. Exhibit 6A (found at AR 102) consists of only a single page. *Id*. The Court does not know what the ALJ intended to cite.

frequently sleep deprived." *Id*. (citing *id*. at 249–56). The ALJ noted that, while Dr. Barnett's evaluation did not suggest impairment in this category, "Dr. Barnett reported that it was difficult to assess inattention with the various features of depression present." *Id*. (citing *id*. at 342). The ALJ also considered the notes in the record that Morris "has random loss of focus and forgets stuff he used to do easily." *Id*. (citing *id*. at 331). The ALJ also addressed opinions from state consultants and the medical expert, which noted "mild to moderate" and "moderate" limitations in this area.

Finally, in finding that Morris had mild limitations in adapting and managing himself, the ALJ referred to Morris's reported symptoms from the hearing and the Function Report. *Id*. According to the ALJ, Morris testified that "he stopped working because he could not get out of bed for a week" and, on his Function Report, "guess[ed] that he would do poorly in handling stress and changes in routine." *Id*. (citing *id*. at 249–56). Morris further "reported to Dr. Barnett that . . . his work-related difficulties were getting there every day and being on time." *Id*. (citing *id*. at 340). However, Morris's "overall appearance and grooming at this evaluation were reasonable" and the psychological consultants found that Morris "does not have any adaptation limitations and is able to adapt to ordinary changes in work routine." *Id*. at 25–26 (citing *id*. at 88, 97, 114, 127).

"Because the claimant's mental impairments do not cause at last two 'marked' limitations or one 'extreme limitation,'" the ALJ concluded, "the 'paragraph B' criteria are not satisfied." *Id*. at 26. He also found that Morris's symptoms did not meet the criteria for paragraph C of listing 12.04 because Morris did not experience periods of decompensation, was not likely to experience such episodes in response to "minimal increase in mental demands or environment," and did not need to live in a supportive environment. *Id*.

Ultimately, the ALJ determined that Morris had "the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can perform simple repetitive work and occasionally respond appropriately to coworkers and the public." *Id*.

While Morris "alleged disability based on depression and insomnia. . . . [t]he medical evidence of record does not provide strong support for the claimant's allegations of disabling

symptoms and limitations." *Id*. at 27. After summarizing the record, the ALJ gave "great weight to the opinion of the medical expert, Ashok Khushalani, M.D." *Id*. at 29 (citing *id*. at 580–87). In Dr. Khushalani's opinion, Morris could "do simple tasks with occasional public contact when sober." *Id*. (citing *id*. at 587). However, the ALJ disagreed with Dr. Khushalani's conclusion that Morris's drug and alcohol use were material to his depression: "his limitations even with drug and alcohol use, does [sic] not result in limitations that would preclude other work as discussed below." *Id*. at 29 (citing *id*. at 585).

The ALJ also "accord[ed] great weight to the assessment of the State agency psychological consultant, Robert Scott, M.D." *Id*.[9] (citing *id*. at 553). According to Dr. Scott:

> [Morris] is able to understand and retain detailed and complex instructions; sustain a routine of detailed and familiar complex tasks under ordinary supervision in setting with limited distraction and minimal personal interaction; relate superficially to familiar coworkers and supervisors; would not relate effectively to the public; and is able to adapt to ordinary changes in work routine.

*Id*. The ALJ noted that "Dr. Scott's opinion is consistent with the record as a whole and Dr. Scott has Social Security Disability Program knowledge." *Id*. at 29.

The ALJ gave "little weight to the opinion of examining psychologist Kathy Barnett, Ph.D." *Id*. (citing *id*. at 340–45). While the ALJ acknowledged Dr. Barnett's finding that Morris "is expected to have quite a lot of trouble with motivation, low energy, and avolition, and he is apt to have limited follow-through," *id*. (citing *id*. at 344), he gave "little weight" to her opinion because he found that she "did not provide an opinion regarding specific mental functional limitations." *Id*. The ALJ also discounted Dr. Barnett's GAF score analysis on the basis that the score is not directly relevant to the issue of whether Morris could perform substantial gainful activity and because GAF scores take into consideration factors unrelated to a patient's claimed disability. *Id*. at 29–30.

Finally, the ALJ gave only "partial weight" to the opinions of treating psychologist Carmela Javellana, M.D in her June 2014 letter and narrative report, citing her "short treatment

---

[9] The ALJ citied Exhibit 9F, which is the resume of Dr. Khushalani. *See* AR at 553. Dr. Scott's opinion appears at AR at 125 (Exhibit 10A at 8).

relationship"and finding that her opinions were "not consistent with the record in some regards." *Id*.

The ALJ also found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR at 30. The ALJ concluded:

> While the claimant has reported that medications do not help his symptoms, the records indicate that he has not consistently been compliant with taking his medications [*id*. at 484, 487, 493, 503]. Additionally, he reported to Dr. Barnett that he is capable of managing his personal hygiene, keeping his appearance relatively neat and clean (although living in his car has limited his self-care); he further reported that he has "no real physical limitations" and has the ability to clean the kitchen, clean the bathroom, vacuum, dust, do dishes, do laundry, go grocery shopping, and cook or prepare easy meals [*id*. at 341]. Thus, his self-described abilities are not fully consistent with his allegations of complete inability to work.

*Id*. Overall, the ALJ wrote, "[a]lthough I do not find the claimant at all times symptom free, the evidence does not support the degree of limitations alleged." *Id*.

The ALJ determined that Morris could not perform his past relevant work given the limitations he identified in the RFC. *Id*. at 31. However, the ALJ also found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id*. (citing 20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)). Because Morris alleged "solely nonexertional limitations," the ALJ turned to section 204.00 of the Medical-Vocational Guidelines under SSR 85-15. *Id*. The ALJ ultimately found that Morris's "ability to perform work at all exertional levels has been compromised by nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels." *Id*. While the ALJ did not identify any specific jobs, he found that Morris could perform gainful employment and was therefore not disabled. *Id*.

### F. Plaintiffs' Contentions

In his summary judgment motion, Morris contends the case needs to be remanded for further proceedings because the ALJ erred in the following respects: 1) the ALJ's weighing of opinion evidence is not supported by substantial evidence because he did not give sufficient

reasons for discounting the opinions of Morris's examining and treating doctors and conversely gave great weight to the opinions of physicians who did not treat or examine him; 2) the ALJ's RFC was not supported by substantial evidence because the only non-exertional limitation – limiting Plaintiff to simple, repetitive work – does not adequately account for the severe depression that the ALJ found at step two and his step three findings that Morris has moderate limitation in understanding, remembering, or applying information and a moderate limitation in concentrating, persisting, or maintaining pace; 3) the ALJ erred at step five by relying on the Medical-Vocational Guidelines (the "Grids") rather than taking testimony from a vocational expert because Morris has exertional limitations that were not reflected in his RFC or addressed in determining what work he can perform. Plaintiff's Motion at 13-21.

## III.    ANALYSIS

### A.    General Legal Standards Governing Judicial Review of Decisions of the Commissioner

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). "This court may set aside a denial of Social Security disability insurance benefits when the [Commissioner's] findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575–76 (9th Cir. 1988). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance." *Desrosiers*, 846 F.2d at 576 (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655. (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

F.2d 993, 995 (9th Cir. 1985)).

"To reject the uncontroverted opinion of a claimant's physician, the ALJ must present clear and convincing reasons for doing so." *Id.* (citations omitted).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *Garrison v. Colvin*, 759 F.3d 995, 1019-1021 (9th Cir. 2014).

### B. The ALJ Erred in Weighing Opinion Evidence

Morris argues that the ALJ erred by giving "great weight" to the opinions of two consultative non-examining physicians (Drs. Khushalani and Scott) while giving little weight to the opinion of his treating psychiatrist, Dr. Javellana, and examining psychologist Dr. Barnett. The Court agrees.

### 1. Legal Standards Governing the Weighing of Medical Opinions

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The Ninth Circuit "afford[s] greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

The Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of a treating or examining physician. *Lester v. Chater*, 81 F.3d at 830-31. "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* ; *see also Magallanes*, 881 F.2d at 751 ("To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must '"make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."). And even where the opinion of a treating or examining physician is contradicted by the opinion of

a nonexamining physician, the "specific and legitimate reasons" standard applies so long as there is medical evidence in the record that supports the opinion of the non-examining physician. *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995) ("when it is an examining physician's opinion that the ALJ has rejected in reliance on the testimony of a nonexamining advisor, reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.").

> ### 2. The ALJ Did Not Provide Specific, Legitimate Reasons Supported by Substantial Evidence for Rejecting the Opinion of Treating Physician Dr. Javellana

In determining that Morris's symptoms were not disabling, the ALJ gave little weight to the opinion of Dr. Javellana, Morris's treating physician. AR at 30. The ALJ explained that he did so because Dr. Javellana's opinion was "based on a short treatment relationship and [was] not consistent with the record in some regards," citing the findings of Dr. Cohen and Dr. Nanda based on mental status exams, *id.* (citing *id.* at 369, 472), and reports that Morris spent time on the computer from physical therapist Dr. Lynette L. Stromberg and Dr. Nanda, *id.* (citing *id.* at 383, 517). Neither reason is sufficient.

It is generally recognized that the length of the treatment relationship may be considered in determining the weight that should be given to a physician's opinions. *See Hunt v. Berryhill*, No. 16-CV-00313-JCS, 2017 WL 1177981, at *18 (N.D. Cal. Mar. 30, 2017). For example, the social security regulations "instruct an ALJ to give more weight to medical opinions from treating sources since they 'are likely to be the medical professionals most able to provide a detailed, *longitudinal picture* of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of . . . consultative examinations. . . .'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)) (emphasis added). Here, however, the ALJ failed to offer any explanation for his apparent conclusion that the two treatment notes cited in his decision undercut the "longitudinal picture" Dr. Javellana developed as a result of treating Morris for close to a year. Given that Dr. Cohen saw Morris only once and the treatment note from Dr. Nanda that the ALJ cited is from Dr. Nanda's first encounter

with Morris, the evidence the ALJ cited does not provide substantial evidence for discounting Dr. Javellana's opinions on the basis of the length of her treatment relationship with Morris.

Further, the ALJ mischaracterized the opinions of Dr. Nanda when he states that Dr. Nanda found that Morris had "normal memory, normal attention/concentration, and high intellect." AR at 30. While Dr. Nanda checked the "unremarkable" box for "Memory/ Concentration" and noted that Morris had "high intellect" (something that Dr. Javellana observed as well, *see* AR at 334), he also found, on the same page in the "targeted symptoms" section of the form, that Morris was moderately impaired with respect to "Cognition/Memory/Thought" and mildly impaired as to "Attention/Impulsivity." *Id.* at 472. The ALJ ignored these findings altogether.

The ALJ also ignored other medical evidence in the record that was consistent with Dr. Javellana's opinions with respect to Morris's ability to problem solve, process information, or concentrate. For example, Dr. Barnett echoed Dr. Javellana's observation that Morris "appeared to have some trouble with attention." *Id.* at 342. Similarly, Dr. Cox noted that, while his mental status was unremarkable, Morris had "decreased ability to concentrate or make decisions" and "[l]ack of motivation." *Id.* at 555–56.

The ALJ also found that Dr. Javellana's assessment that Morris had no interests was inconsistent with other examining providers' reports that he "spends a lot of time on the computer." *Id.* at 30 (citing 383, 517). This supposed inconsistency appears to be merely a matter of semantics and what counts as an "interest." Dr. Javellana, like the two providers cited by the ALJ, observed that on "bad days" Morris did "stuff on the computer," *id.* at 320, finding that he was "socially undeveloped" and "had no friends." *Id.* at 334, 336. Similarly, the note by Dr. Stromberg describes Morris as "depressed" and then states "[l]ots of time with computer - videos and games; not much time out. No friends." *Id.* at 383. The other provider cited by the ALJ observed that Morris "sat around and watched internet" on the day of the visit. *Id.* at 517. Moreover, the record as a whole is also consistent with Dr. Javellana's opinion. For example, a provider at Contra Costa Health Services found Morris's impairment as to "Recreational/Leisure Activities" to be in the moderate to severe range. *Id.* at 466. Likewise, Dr. Cox found that Morris "has no hobbies," noting that that when asked about his hobbies, Morris reported that he used

"computer games and watching movies to distract his negative thoughts." *Id*. at 556.

In sum, the Court finds that the ALJ failed to offer specific and legitimate reasons supported by substantial evidence for giving only partial weigh to Dr. Javellana's opinions.

### 3. The ALJ Did Not Provide Specific, Legitimate Reasons Supported by Substantial Evidence for Rejecting Dr. Barnett's Opinion

ALJ gave "little weight" to the opinion of Dr. Barnett, finding that she "did not provide an opinion regarding specific mental functional limitations" and that the GAF score she offered of 45-50 was "not an absolute determiner of work ability." *Id*. at 29.  While the ALJ did not err in declining to rely upon the GAF score, Dr. Barnett's failure to address "specific mental limitations" is not a specific and legitimate reason for discounting the opinions she offered that are clearly relevant to those limitations.

An ALJ may ignore a claimant's GAF score without committing error "because a GAF score is merely a rough estimate of an individual's psychological, social, or occupational functioning used to reflect an individual's need for treatment, but it does not have any direct correlative work-related or functional limitations." *Hughes v. Colvin*, 599 F. App'x 765, 766 (9th Cir. 2015).  On the other hand, Dr. Barnett offered detailed observations regarding Morris's difficulties caused by his depression, including problems with sleep that reduce his ability to pay attention, "trouble with motivation, low energy, and avolition," and "limited follow-through." *Id*. at 344.  While she did not explicitly address the specific paragraph B functional limitation categories, her findings were highly relevant to Morris's ability to function in a workplace. Moreover, her observations are consistent with the opinions of both Dr. Javellana and Dr. Banda with respect to those categories.  As the Social Security Administration has recognized, "response to the demands of work is highly individualized" for individuals with mental impairments, *see* SSR 85-15, making this type of information particularly important for making determinations of disability where mental impairments are alleged.  The fact that Dr. Barnett did not specifically address the enumerated paragraph B categories is not, therefore, a specific and legitimate reason for disregarding Dr. Barnett's opinions.

### 4. The Opinions of the Non-Examining Sources are Not Substantial Evidence

"Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Morgan*, 169 F.3d at 600 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id*. at 600–01 (quoting *Magallanes*, 881 F.2d at 750 (9th Cir. 1989)). The ALJ's findings with respect to Morris's limitations are based largely on the opinions of Drs. Khushalani and Scott, which the ALJ gave great weight. The Court concludes, however, that the opinions of these nonexamining physicians do not constitute substantial evidence that supports the ALJ's findings.

First, the ALJ gave Dr. Scott's opinion great weight based on his finding that it was consistent with the record as a whole but the Court finds instead that there is significant evidence in the record that is in conflict with Dr. Scott's findings and indicates that Morris's impairments are more severe than Dr. Scott opined. *Compare id*. at 113 (Dr. Scott's finding of no limitations in understanding and memory) *with id*. at 472 (Dr. Nanda's finding of moderate impairment in cognition, memory, and thought); *id*. at 114 (Dr. Scott's finding that Morris would be moderately limited in his interactions with the public, coworkers, or peers) *with id*. at 472–73 (Dr. Nanda finding that Morris had a severe functional impairment in "Peer Relations" and "Socialization/ Communication"); *id*. at 114 (Dr. Scott opining that Morris was "[a]ble to sustain a routine of detailed and familiar complex tasks under ordinary supervision.") *with id*. at 365 (Dr. Javellana opining that Morris was "unable to process information, problem-solve; unable to concentrate and complete writing task. Can help out his brother with prompting and constant redirection.").

Further, the ALJ did not provide any explanation for giving great weight to Dr. Khushalani's opinion that Morris could perform simple tasks with occasional public contact when sober, which is contradicted by the opinions of his examining and treating physicians, as discussed above. *See* id. at 29. To the extent the ALJ was relying on the factors that led him to discount the opinions of those physicians, those reasons are insufficient for the reasons discussed above.

Therefore, the Court finds that the ALJ failed to provide specific and legitimate reasons

supported by substantial evidence for discounting the opinions of treating medical source Dr. Javellana and examining medical source Dr. Barnett in favor of the nonexamining consultative physicians in evaluating Morris's ability to work.

### C. The ALJ's RFC Assessment Is Not Supported by Substantial Evidence

Morris contends the ALJ's RFC does not adequately take into account his finding at step two that Morris's major depressive disorder is a severe impairment and his paragraph B findings that Morris is moderately limited in understanding, remembering, or applying information and moderately limited in concentrating, persisting, or maintaining pace.   The Court agrees.

"[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)).  In *Stubbs-Danielson*, the  ALJ found that the claimant "retain[ed] the residual functional capacity to perform simple, routine, repetitive sedentary work, requiring no interaction with the public" even though the claimant's treating physician "diagnosed her with borderline intellectual functioning and said she showed good persistence, but a slow pace in thought and action." 539 F.3d at 1171.  The claimant argued that the "ALJ failed to account for a number of significant functional limitations assessed by the doctors of record, including difficulties in maintaining pace, and failed to provide reasons for rejecting those doctors' opinions, but the court rejected that argument." *Id.* at 1173.  The court rejected that argument, however, reasoning that the RFC was consistent with the evidence in the record.  *Id.*  In particular, the court found that while the claimant's treating doctor noted "slow pace" he did not address whether the claimant could work on a sustained basis, whereas  a state agency doctor who reviewed the record *had* addressed this question, concluding that the claimant could work on a sustained basis if the job involved only simple tasks with no public contact. *Id.* at 1171.  Thus, the court found that "[t]he ALJ translated Stubbs–Danielson's condition, including the pace and mental limitations, into the only concrete restrictions available to him." *Id.* at 1174.

Subsequently, in at least two unpublished cases the Ninth Circuit has held that limiting the

31

claimant's potential work to simple work did not sufficiently account for moderate limitations in concentration, persistence, or pace.  *See Brink v. Comm'r of Soc. Sec. Admin.*, 343 F. App'x 211, 212 (9th Cir. 2009) ("The Commissioner's contention that the phrase 'simple, repetitive work' encompasses difficulties with concentration, persistence, or pace is not persuasive");  *Lubin v. Comm'r of Soc. Sec. Admin.,* 507 F. App'x 709, 712 (9th Cir. 2013) (where RFC limited claimant to "one to three step tasks" based on ALJ's finding that the claimant suffered moderate difficulties in maintaining concentration, persistence, or pace, holding that "ALJ erred by not including this limitation in the residual functional capacity determination or in the hypothetical question to the vocational expert").  In *Brink*, the Ninth Circuit distinguished *Stubbs-Danielson* on the basis that in that case "[t]he medical testimony . . . did not establish any limitations in concentration, persistence, or pace."  *Brink*,  343 F. App'x at 212.

Following *Brink* and *Lubin*, "numerous courts . . . have found reversible error where an ALJ finds that a claimant has moderate limitation in maintaining concentration, persistence, or pace, but purports to account for that limitation in the RFC only by limiting the claimant to simple, repetitive, or unskilled work."  *Linda O.D.G. v. Berryhill*, No. CV 17-07170-AFM, 2018 WL 6308105, at *6 (C.D. Cal. Nov. 30, 2018) (citing *John C. v. Berryhill*, 2018 WL 3388918, at *9 (C.D. Cal. July 9, 2018); *Friesth v. Berryhill*, No. CV 16-3535-KES, 2017 WL 901882, at *6 (C.D. Cal. Mar. 7, 2017); *Alva v. Colvin*, 2016 WL 6561452, at *6 (C.D. Cal. Nov. 2, 2016); *Sanchez v. Colvin*, 2016 WL 1948782, at *5 (C.D. Cal. May 3, 2016);  *Willard v. Colvin*, No. CV 14-9342-KES, 2016 WL 237068, at *3 (C.D. Cal. Jan. 20, 2016), judgment entered, No. CV 14-9342 KES, 2016 WL 242798 (C.D. Cal. Jan. 20, 2016); *Woodward v. Colvin*, 2015 WL 8134375, at *7 (C.D. Cal. Dec. 4, 2015)).

On the other hand, some district courts have applied the reasoning in *Stubbs-Danielson* to find that an RFC limiting the claimant to simple tasks was not inconsistent with the ALJ's finding that the claimant was moderately limited as to concentration, persistence or pace based on the specific medical evidence in the record.  *See, e.g., Mitchell v. Comm'r of Soc. Sec.*, No. 2:12-CV-0358-CMK, 2013 WL 5372852, at *5 (E.D. Cal. Sept. 25, 2013), aff'd sub nom. *Mitchell v. Colvin*, 642 F. App'x 731 (9th Cir. 2016).  These cases explain that "the special analysis for

mental disorders, which includes an assessment of concentration, persistence, and pace, is a severity analysis which is distinct from the functional analysis at step five of the sequential evaluation." *Id.* (citing *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir.2007); *see also Phillips v. Colvin*, 61 F. Supp. 3d 925, 940 (N.D. Cal. 2014) ("As relevant here, a moderate difficulty in concentration, persistence, or pace does not automatically translate to a RFC finding with these limitations.").

The Commissioner contends the Court should not follow *Brink* and its progeny because *Brink* is an unpublished case and in it the court mischaracterized *Stubbs-Danielson* by saying there was no medical evidence that the claimant in that case was limited as to concentration, persistence or pace when in fact there was. The Court need not reach the question of whether *Brink* was wrongly decided, however, because it finds that under the rule announced in *Stubbs-Danielson*, the ALJ's RFC in this case is not supported by substantial evidence in the medical record with respect Morris's limitations in concentration, persistent or pace.

As discussed above, numerous doctors who examined or treated Morris found that his functional limitations were more severe than was found by the nonexamining doctors whose opinions were given great weight, particularly with respect to Morris's limitations in the area of concentration, persistence and pace. The ALJ failed to offer specific and legitimate reasons supported by substantial evidence for giving partial or little weight to these opinions and did not account for these functional limitations in his RFC. Therefore, the ALJ erred in adopting an RFC that contained no nonexertional limitations except the limitation to simple repetitive work with occasional contact with coworkers and the public.

**D.** **Whether the ALJ Erred by Applying the Grids Rather Than Taking Testimony From A Vocational Expert**

"The Secretary can satisfy [his Step Five] burden by either (1) applying the Medical–Vocational Guidelines ('grids') in appropriate circumstances or (2) taking the testimony of a vocational expert." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988) (citing *Desrosiers v. Secretary of H & HS*, 846 F.2d 573, 577-78 (9th Cir. 1988)). The grids may be used "only when they 'accurately and completely describe the claimant's abilities and limitations.'" *Id.* (quoting

United States District Court
Northern District of California

*Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir.1985)). "[W]hen a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations, the grids are inapplicable" and the ALJ must take testimony from a vocational expert and identify specific jobs the claimant can perform. *Id.* (quoting *Desrosiers*, 846 F.2d at 577). However, a step-two determination that a non-exertional impairment is severe does not by itself require that the ALJ seek the assistance of a vocational expert at step five. *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007).

Here, the medical record is replete with medical opinions indicating that Morris had functional limitations that are sufficiently severe that that they would likely significantly limit Morris's ability to work. Therefore, VE testimony was necessary to make the "heavily individualized" determination whether and how Morris's depression would affect his ability to perform unskilled work. *See* SSR 85-15 (providing that "[t]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . . Thus, the mentally impaired may have difficulty meeting the requirement of even so-called 'low stress' jobs."); *Barbosa v. Colvin*, No. 1:13-CV-410 GSA, 2014 WL 4929420, at *7 (E.D. Cal. Sept. 30, 2014) ("Here, the ALJ did not adequately consider this portion of SSR 85–15 in her analysis, as her discussion omits this portion of the rule. . . . Thus, a VE's testimony is necessary to assess the impact of this non-exertional limitation on Plaintiff's ability to work."). Therefore, the Court finds that the ALJ erred in relying on the Medical-Vocational Guidelines and failing to obtain testimony from a VE that addressed Morris's ability to work in light of those functional limitations.

### E.    Remand for Further Administrative Proceedings Appropriate

"A district court may to affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). Here, the Court finds that further proceedings are necessary to address the ALJ's errors and to allow the Commissioner to weigh the medical evidence with

respect to the severity of Morris's impairments, reevaluate Morris's paragraph B limitations, determine Morris's RFC and take testimony from a vocational expert about the jobs Morris is able to perform.[10]

## IV.    CONCLUSION

For the reasons discussed above, Morris's motion is GRANTED, the Commissioner's motion is DENIED and the matter is REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk is instructed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated:  March 19, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

_____

[10] In considering the severity of Morris's impairments at step two, the ALJ should consider on remand *all* of Morris's alleged impairments, including his alleged insomnia/hypersomnia. Although Morris did not specifically challenge the ALJ's conclusion at step two on this question, the Court has reviewed the record and finds that the ALJ's finding of non-severity as to this alleged impairment is likely erroneous.  In particular, the ALJ's conclusion that Morris's insomnia/hypersomnia was  merely "due to lifestyle choices," including "staying up late on the computer and drinking alcohol and energy drinks at night," *id*. at 24, is contradicted by the vast majority of the evidence in the record, which shows that Morris has had serious sleep problems since childhood and that repeated attempts to address the problem through medication have failed. Likewise, the ALJ's conclusion that Morris's hypersomnia does not "more than minimally affects his ability to perform basic work activities," *id*., is also contradicted by the record, which indicates that Morris was unable to continue working because of his sleep issues and when he was still working he had difficulty concentrating due to sleep deprivation and maintaining a regular schedule.